IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF CERTAIN ELECTRONIC DEVICES | Case No. 22-mj-689 |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR SEARCH WARRANT**

I, Glenn G. Booth, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION**

1.     On August 8, 2017, the Honorable Richard A. Lloret authorized a warrant to search two cellular telephones seized during the arrest of a sex trafficker named Kevin SMITH on or around July 3, 2017 pursuant to an open arrest warrant.  *See* No. 17-mj-1065; Attachment C.

| ELECTRONIC DEVICE | DESCRIPTION | SUSPECTED USER |
|---|---|---|
| **Target Device 1** | A silver LG Cellular phone (LGMS 210) bearing serial number 704CYQX807876 | Kevin Smith |
| **Target Device 2** | A black ZTE Cellular Phone Model Number Z981, serial number 320474942626 with a cracked face | Kevin Smith |

(herein the **Target Devices**).

2.     At the time the Court issued the search warrant however, law enforcement lacked the technology to fully access and search the content of the phones except for a limited extraction of data from the phones' SIM cards.

3.     After recent consultation with Regional Computer Forensics Laboratory (RCFL) Forensic Examiners with the Federal Bureau of Investigation ("FBI"), I have learned that the FBI's technological capability to access, extract, and search the digital content of these cellular telephones has since advanced to enable successful extraction of the content authorized by the

original warrant.  Even though the initial search warrant signed by Judge Lloret arguably authorizes this effort to extract the phones as a continuation of the original search, and even though SMITH has never requested the return of these phones, I am still—in the abundance of caution—submitting this affidavit for another warrant to search the **Target Devices** described above and in Attachment A.  The applied-for warrant would authorize the forensic examination of the **Target Devices** for the purpose of identifying electronically stored data particularly described in Attachment B, which constitutes evidence, contraband, fruits and instrumentalities of violations of Title 18, United States Code, Section 1591 (sex trafficking of minors and sex trafficking by force).  The **Target Devices** are currently located in FBI custody in Philadelphia, Pennsylvania.

## <u>AGENT BACKGROUND</u>

4.      I am a Special Agent with the Federal Bureau of Investigation (FBI).  I have been employed as a Special Agent of the FBI for over twenty-four years, and am currently assigned to the Philadelphia Division, Fort Washington Resident Agency, where I investigate various matters including Violent Crimes Against Children.  During my career, I have worked cases involving but not limited to Sex Trafficking, Child Sex Trafficking and Child Pornography.  I have also worked dozens of cases involving the use of the internet and social media to perpetrate crimes such as Violent Crimes Against Children and Child Sex Trafficking.  I have gained experience through my participation in these cases and through training at the FBI Academy, numerous conferences, and online training courses.  I have also presented case studies regarding Child Sex Trafficking at regional and national conferences.

5.      In my training and experience, criminals who manage sex trafficking enterprises frequently use violence, intimidation, and physical force to run their affairs.  These sex traffickers sometimes use force to protect their victims from threats posed by customers, but also often use

violence to force women or girls to remain working for them conducting commercial sex.  I am also aware, from my training and experience, that sex traffickers frequently manipulate and abuse—both physically and emotionally—women in order to force them to engage in prostitution, and exploit women sexually and financially for themselves.  Relatedly, sex traffickers frequently target vulnerable women, including drug addicts, juveniles, and other distressed or troubled females, to entice them to engage in commercial sex on their behalf.  I am also aware that sex traffickers often provide women with controlled substances in order to foster their attachment (via addiction) to the sex trafficker as well as the sex trafficking enterprise.

6.      Based on my training and experience working sex trafficking cases, I am aware that criminals who profit from the sex trafficking of women and children in violation of federal law frequently use digital user accounts, including e-mail address accounts, social media accounts, and Internet websites, to further their activities.  For example, sex traffickers frequently use Internet websites to advertise the sexual services of their victims.  These websites include Craig's List, Backpage.com,[1] Skip the Games, MegaPersonals, and other sites that allow classified or anonymous advertisements of this nature.  I am also aware, from my training and experience, that users must set up accounts to post such advertisements that are linked to an electronic mail account ("e-mail address").

7.      I am also aware based on my training and experience that sex traffickers frequently use cellular telephones to further their sex trafficking crimes.  For example, sex traffickers may employ cellular telephones to (1) coordinate and communicate with coconspirators; (2) take pictures of sex trafficking victims to post online sex advertisements; (3) transact with potential customers of a sex trafficking enterprise; (4) recruit sex trafficking victims; (5) post online,

---

[1] This website is now defunct. Its servers were seized by the FBI in April 2018.

broadcast, or otherwise advertise the sex trafficking enterprise; (6) set the details and logistics for commercial sex acts; and (7) access the internet to further the sex trafficking enterprise. Accordingly, a search of these cellular phones may reveal evidence of sex trafficking crimes in the form of text messages, voice call records, phone contact lists, photographs, images, videos, internet web history, and other content.

8.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  The facts I am asserting do not reflect each and every detail I know about this investigation, including the evidence against SMITH.  Instead, I am only including details sufficient to show probable cause for the requested warrant.  The affidavit therefore does not set forth all of my knowledge, or the knowledge of others, about this matter.

## **PROBABLE CAUSE**

9.     The Federal Bureau of Investigation as well as state and local law enforcement have been investigating Kevin SMITH (DOB: 07/14/1994) for several years for a sex trafficking enterprise he has conducted from on or around July 31, 2015 to October 1, 2019 using actual or threatened physical force and violence, and which has involved minors.

10.     As detailed below, there is probable cause that SMITH has violated Title 18, United States Code, Section 1591 (sex trafficking of minors and sex trafficking by force), and that a search of the **Target Account** will reveal evidence of those crimes.  As described below, both confidential witnesses and law enforcement officers relate that SMITH has run an illegal sex trafficking enterprise that has involved violence and underage girls.

*Law Enforcement Arrests and Interviews (2015-2018)*

11.     On September 4, 2015, Bensalem Police Department officers responded to a call for a violent domestic disturbance at the Quality Inn Hotel at 3671 Street Road, Bensalem, Pennsylvania to find a Confidential Witness ("CW1") visibly beaten with "several ligature marks around her neck" and "bruises on her left arm."   When interviewed, CW1 told officers she prostituted for her "pimp" SMITH for the past two-and-a-half months during which SMITH would post online advertisements (including on Backpage.com) for interested sex buyers to have sex with CW1 for money.  CW1 related that SMITH would retain all proceeds from the commercial sex acts (up to $1,000 a day) and effectively forced her to work for free save for taking care of her expenses.  In fact, CW1 stated that SMITH physically assaulted her because on this occasion CW1 protested the work conditions and attempted to keep the money for her own.   Enraged, SMITH grabbed CW1 by the throat and choked her to the point of losing consciousness.   He then threw her across the room and slammed her head on a mattress, causing her glasses to break and lacerating her beneath her left eye.  After the incident, SMITH seized the proceeds of CW1's sex acts that night ($800) and left.  CW1 provided a signed statement back at the police station and photographs were taken of her injuries.

12.     On November 9, 2016, undercover officers with the Bensalem Police Department responded to an advertisement for sexual services by a minor CW4 (DOB: 07/xx/1999) at the Radisson Hotel, and found CW4 in a hotel room (430) rented out by and registered in the name of CW1.  Investigators subsequently found CW1 in another room (649) in the hotel she had rented. CW4 did not cooperate with law enforcement regarding the underlying sex trafficking scheme, but did admit to engaging in prostitution in the past.  She was arrested for prostitution.

13.     A week later, investigators once more interviewed CW4.   On this occasion, November 14, 2016, investigators tried to have CW4 identify her "pimp," but CW4 claimed that

she was working on her own.  Both federal and state law enforcement believe CW4 was attempting to protect SMITH from criminal liability.  Nevertheless, when pressed, CW4 did admit that SMITH was engaged in illegal sex trafficking, and—most notably—admitted that she had been prostituted by SMITH years ago underage (she was even still a minor at the time of this interview). She further stated that she had been prostituted at numerous hotels in Bensalem Township and Bristol Township during this time with both CW1 and SMITH.  Investigators requested to search CW4's phone, at which point she stated that they would find text messages to SMITH involving giving him money, and that CW1 had given her the phone.  While she denied being prostituted by SMITH and CW1 during this time, based on my investigation and these admissions by CW4, I believe that CW4 was being trafficked by SMITH's sex trafficking enterprise during this period.

14.    On June 26, 2017, Philadelphia Police Department officers responded to a report of a violent assault at or around 6144 Pine Street, Philadelphia, Pennsylvania.  Upon arrival, officers observed visible injuries (bruise under eye, scratch marks/bruises on neck) on CW1, who reported that SMITH had struck her in the face multiple times with a closed fist and choked her.

15.    A few days later, on June 30, 2017, Tinicum Township Police Department officers responded to another call for a violent assault committed by SMITH on CW1 at the Wyndham Gardens Hotel, Room 452, at 45 Industrial Highway, Essington, Pennsylvania.  When officers arrived, medical personnel were already treating CW1 for her injuries—including visible facial injuries as well as body trauma.  Officers interviewed CW1, who reported that SMITH forcibly entered her hotel room and immediately attacked her with punches to the face and kicks to her body.  SMITH proceeded to choke CW1 until she was unconscious, and then fled when an eyewitness saw the violent assault and called police.

16.    In the aftermath of law enforcement responding to the scene, and during their interview of CW1, SMITH called CW1 on her cell phone repeatedly.  CW1 answered her phone at one point, and one of the police officers overheard a male (believed to be SMITH) stating that he did not kick her in the face, and only punched her in the face.

*Witness Statements*

17.    CW1 has been interviewed by law enforcement several times[2] in relation to SMITH's sex trafficking enterprise.  To my knowledge, CW1 has not cooperated in the hopes of leniency on pending charges.  She has, however, at times minimized her own role and that of SMITH in the sex trafficking business, including in an interview on January 21, 2017 where she omitted much of the illegal acts committed by SMITH that are discussed in this affidavit. However, she would later state in her July 25, 2017 interview that she was afraid that SMITH would direct violence against her if she cooperated against him.

18.    To summarize the content of these interviews, CW1 functioned as the "bottom" (i.e. a trusted subordinate/deputy who would assume some tasks of running the sex trafficking enterprise) for SMITH during an extensive period of his sex trafficking, and she related that SMITH conducted a sex trafficking ring from the time she met him (July 31, 2015) until her last contact with him in or around the summer of 2017.  She stated that SMITH would manage the prostitution of several (five or six) girls at a time during this period, including underage girls such as CW4 and another minor named "Diamond" (real name unknown), and specifically recalled

---

[2] These interviews occurred as follows: (i) September 4, 2015 by the Bensalem Police Department in response to a 9-1-1 call for a violent assault; (ii) June 3, 2016 by the Bensalem Police Department in response to a call for a domestic disturbance; (iii) June 30, 2017, in the Taylor Hospital, 175 East Chester Pike, Ridley Park, Pennsylvania, by the Federal Bureau of Investigation after SMITH violently assaulted her; (iv) July 25, 2017 by the Federal Bureau of Investigation once CW1 was released from the hospital in the aftermath of the June 30, 2017 assault.

CW4 being prostituted by SMITH in Buck's County, Pennsylvania, in the fall of 2016. This information has been corroborated during the arrest of CW1 and CW4 on November 9, 2016, and the post-arrest interviews of CW4 that occurred afterward. CW1 claims she did not know CW4 was underage until this incident, but recollected that SMITH met CW4 on Instagram.

19.     CW1 also identified "Diamond" (Name Unknown), "Shay" (Name Unknown), CW2, another underage girl named "Diamond" (Name Unknown), and other girls who worked for SMITH during this time. CW1 stated that SMITH frequently used violence to coerce women to remain in his employ and effectively work for free (he would pay expenses). CW1 recalls one incident in the spring of 2017 where SMITH punched "Diamond" in the face and broke her nose during an argument over the arrangement. CW1 specifically estimates that SMITH beat her more than fifty times, and she would "get the shit beaten out of her" anytime she questioned SMITH's relationship with other girls or the financial arrangement of the business. CW1 also recalled one incident where she did not give SMITH the money earned from prostituting: SMITH drove to pick her up under the pretense of taking her out to eat, and then beat her and left her on the side of the road. CW1 recalled another incident in or around November or December 2016, when she tried to leave him at 30th Street Station in Philadelphia, Pennsylvania. SMITH pursued her with an associate ("Jay") and physically dragged her to his car before putting a firearm to her stomach and pulling the trigger. According to CW1, the gun jammed.

20.     Confidential Witness 2 ("CW2") also prostituted for SMITH and was interviewed on October 4, 2017, and October 11, 2017. CW2 claims she knew SMITH for many years and was aware that he had a sex trafficking ring during that time period, which included a minor girl ("Mxxxx") who was approximately fifteen years old at the time. CW2 relates, however, she only began to work for SMITH in early 2017 in Wilmington, Delaware. CW2 corroborated that either

SMITH, herself, or another girl would post advertisements online for her sexual services, and then set up encounters with interested sex buyers. CW2 also stated that SMITH demanded *all* of the money she earned from prostitution, and that SMITH would only pay her expenses, although on occasion he would provide her with marijuana or Percocet pills.

21.     CW2 corroborated that SMITH violently forced women to engage in sex trafficking.[3]   She recalls one occasion, on a date she cannot remember precisely, in which SMITH slapped her in a hotel room because CW2 complained about the arrangement of her working for him for free, and therefore wanted to leave him. She stated that SMITH slapped her on multiple occasions while she prostituted for him. While on one occasions she did state that she did not "necessarily" stay with SMITH because she was afraid, on other occasions she did admit she was afraid of him, that he would not let her leave, and that he often carried firearms. CW2 also observed SMITH physically assault CW1 on multiple occasions during this period (circa early 2017 to October 2017), and that CW1 warned CW2 that SMITH was dangerous and had in fact killed people.

22.     Confidential Witness 3 (CW3) also was prostituted by SMITH, and was interviewed on January 8, 2018 and October 5, 2018. She confirmed SMITH managed a sex trafficking enterprise in the greater Philadelphia area from 2017 to 2018 in which he would retain all revenue earned by the women, and would only provide their basic expenses such as food and clothing. CW3 corroborated that CW1 and CW2 were prostituted by SMITH, and CW1 functioned as the "bottom" girl. CW3 claimed that SMITH managed several girls during this period

---

[3] I have since learned that CW2 passed away on March 29, 2020 in a drug overdose unrelated to this case.

(including CW1 and CW2), and that either himself or CW1 would book the hotel rooms for CW3 and other women to engage in commercial sex.

23.     CW3 also detailed that SMITH would violently assault women, and recalls the aforementioned incidents in which SMITH physically assaulted both CW1 and CW2.  SMITH also physically beat CW3 (breaking her nose) inside of a vehicle, she claimed, after he learned that she was talking to another male on the phone.  On another occasion while SMITH was running his sex trafficking enterprise in Delaware, he beat CW3, threw her down a flight of stairs, and then threw a firearm at her.  CW3 also recalled that all women who worked for SMITH had to get tattoos of his name on their body (a claim CW1 made as well), and investigators have observed and photographed some of these tattoos.   CW3 stated that, in general terms, that she felt that she could never leave SMITH out of fear of violent retaliation.

24.     As noted above, CW4 (a minor) provided some limited information regarding SMITH during interviews on November 9, 2016 and November 14, 2016, although these statements did indicate, as I explained above, that she was being prostituted by SMITH during this period.  While CW4 has discussed being trafficked by other sex traffickers besides SMITH in other interviews (conducted on January 3, 2016 and May 31, 2016), she has declined other attempts by law enforcement to ask her about SMITH's sex trafficking activities.   However, in another interview in August 27, 2018 conducted by the FBI, CW4 claimed that SMITH approached her recently to solicit her to prostitute for him.  The timing of this solicitation is not clear, and CW4 had recently turned 18 years old at the time of the interview.

***Interview of Kevin Smith (January 25, 2017)***

25.     On January 21, 2017, the FBI interviewed SMITH under the pretense of wanting information regarding another sex trafficker named Derrick HEPPARD.   SMITH agreed to the

interview, during which he admitted to sharing proceeds with CW1 in a sex trafficking enterprise, but claimed it was consensual and equitable.  While he denies ever managing minor CW4, he confessed that he put CW4 in touch with CW1 for the purposes of reentering the sex trafficking business with her.

## THE TARGET DEVICES

26.     SMITH assaulted CW1 on or around June 30, 2017, which led law enforcement from the County of Delaware, Pennsylvania, to obtain a warrant for his arrest.   In the aftermath of this incident, CW1 stated that SMITH utilized two cellular phones, a grey colored phone (**Target Device 1**) and a black ZTE phone (**Target Device 2**) that he used to communicate with CW1.  CW1 also stated that the aforementioned phones had the phone numbers 267-748-4036 and 267-586-7871.

27.     On or about July 3, 2017, SMITH was located and arrested in a reported stolen vehicle in the parking lot of the Clarion Collection Hotel located in Arlington, Virginia. Also present at the time of arrest were two females to include CW3, who stated that she was scared of SMITH and he took money from her. At the time of SMITH'S arrest, he was in possession of two phones, **Target Device 1** and **Target Device 2**.  **Target Device 1** was located on SMITH'S person, and SMITH provided the cellular number of 267-748-4036 (a number that matched the cellular telephone number provided by CW1 for SMITH).  **Target Device 2** was located in the car and CW3 informed arresting officers that the phone belonged to SMITH and would contain SMITH's text messages

28.     As summarized above, there is probable cause to believe that SMITH has committed violations of Title 18, United States Code, Section 1591 (sex trafficking of minors

and sex trafficking by force). I further submit that there is probable cause that SMITH has used the **Target Devices** and that a search of the **Target Devices** will reveal evidence of a crime.[4]

29.    CW3 provided consent to search CW3's cellular phone. Your affiant reviewed historical text messages on CW3's cellular phone. CW3's phone contains text messages between CW3 and cell phone number 267-748-4036 (believed to be **Target Device 1**) that discuss outcalls, incalls, dates, hotels, condoms, "daddy", and other terms known to your affiant to be associated with sex trafficking organizations. CW3 also received text messages with photos of pre-paid gift cards from phone number 267-586-7871 (believed to be **Target Device 2**). Based on your affiant's training and experience, pre-paid credit cards were often used to post advertisements on the website, Backpage.com, an online prostitution advertisement service. CW1 also stated that SMITH would send her photos via text messages of pre-paid cards he bought in order for her to post prostitution advertisements.

30.    CW1 also provided consent to search her cellular phone. Your affiant reviewed text messages on CW1's phone. CW1 had text messages between her and both 267-748-4036 (believed to be **Target Device 1**) and 267-586-7871 (believed to be **Target Device 2**). These messages included conversations regarding dates, how much money CW1 made, discussed CW1 having "regulars" on the way. Based on my training and experience with these types of investigations, your affiant knows that "regulars" are people prostitutes have sex with for money on a regular basis. There were text message discussions about needing prepaid cards in order to

---

[4] A federal grand jury returned an indictment against Kevin SMITH on July 29, 2021. *See United States v. Smith*, 21-288-GEKP. However, neither this charge nor his previous arrest affects the probable cause that a search of the **Target Devices** will reveal evidence of a crime, nor does it in affect the authority for the Court to issue a search warrant for an investigation that is still ongoing.

post advertisements and also discussing money to reserve rooms.  There are also text messages regarding the abuse and bruising CW1 sustained.

31.     On July 13,2017, in compliance with a Federal Grand Jury Subpoena, Backpage.com provided numerous advertisements and supporting invoices related to the email address, kevinsmith689@gmail.com, and other emails and phone numbers suspected to be used by SMITH in furtherance of his prostitution organization. The advertisements reveal photos of girls posing in lingerie or nude. They also include photos of CW1, CW2, and CW3. CW3 was a minor at the time the advertisements were posted. Additionally, there are photos of SMITH in prostitution advertisements posted by a subscriber utilizing the email kevinsmith689@gmail.com.

32.     Based on the above facts, your affiant believes that SMITH utilized the two phones taken into custody at the time of his arrest (the **Target Devices**) to communicate to others involved in his sex trafficking organization. The phones in FBI custody have the capability to access the internet, and therefore, based on the facts mentioned above, there is reason to believe that the phone was used to access the webpage, Backpage.com or other sites used to violate 18 U.S.C. § 1591. Based on the facts in this affidavit, your affiant has probable cause to believe that text messages, email addresses, websites visited, and other web-based applications on the target phones may have information about other women and underage girls that were trafficked by SMITH, as well as other evidence to support violations of 18 U.S.C. § 1591.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

33.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the

Internet are typically stored for some period of time on the device.  This information can
sometimes be recovered with forensics tools.

     34.   *Forensic evidence.*  As further described in Attachment B, this application seeks
permission to locate not only electronically stored information that might serve as direct
evidence of the crimes described on the warrant, but also forensic evidence that establishes how
the Device was used, the purpose of its use, who used it, and when.  There is probable cause to
believe that this forensic electronic evidence might be on the Device because:

    a.   Data on the storage medium can provide evidence of a file that was once on the
storage medium but has since been deleted or edited, or of a deleted portion of a
file (such as a paragraph that has been deleted from a word processing file).

    b.   Forensic evidence on a device can also indicate who has used or controlled the
device.  This "user attribution" evidence is analogous to the search for "indicia of
occupancy" while executing a search warrant at a residence.

    c.   A person with appropriate familiarity with how an electronic device works may,
after examining this forensic evidence in its proper context, be able to draw
conclusions about how electronic devices were used, the purpose of their use, who
used them, and when.

    d.   The process of identifying the exact electronically stored information on a storage
medium that is necessary to draw an accurate conclusion is a dynamic process.
Electronic evidence is not always data that can be merely reviewed by a review
team and passed along to investigators.  Whether data stored on a computer is
evidence may depend on other information stored on the computer and the
application of knowledge about how a computer behaves.  Therefore, contextual

information necessary to understand other evidence also falls within the scope of the warrant.

    e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

35.    *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

36.    *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

37.    Based on the foregoing, I request the Court authorize a search of the **Target Devices,** further described in Attachment A, for evidence, contraband, fruits and instrumentalities of violations of Title 18, United States Code, Section 1591, further described in Attachment B, and respectfully request that a search warrant be issued.

Respectfully Submitted,

/s/ *Glenn Booth*
Special Agent Glenn Booth
Federal Bureau of Investigation

Subscribed and sworn to before me on May 9th, 2022,

_____/s/ Lynne A. Sitarski_____
HONORABLE LYNNE A. SITARKSKI
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with:

| ELECTRONIC DEVICE | DESCRIPTION | SUSPECTED USER |
|---|---|---|
| **Target Device 1** | A silver LG Cellular phone (LGMS 210) bearing serial number 704CYQX807876 | Kevin Smith |
| **Target Device 2** | A black ZTE Cellular Phone Model Number Z981, serial number 320474942626 with a cracked face | Kevin Smith |

(herein the **Target Devices**).

The Devices are currently in the custody of the FBI Philadelphia.

This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

## <u>ATTACHMENT B</u>

### ITEMS TO BE SEARCHED AND SEIZED

1.        The **Target Devices** listed in Attachment A may be searched for evidence

violations of 18 U.S.C. § 1591 (sex trafficking by force and of minors), from July 2015 to

August 3, 2017, including but not limited to:

        a.        lists of customers, coconspirators, and related identifying information;

        b.        types, amounts, and prices in relation to the sex trafficking enterprise as

well as dates, places, and amounts of specific transactions;

        c.        any information related to individuals related to the sex trafficking

enterprise (including names, addresses, phone numbers, or any other identifying information);

        d.        any information recording the phone users' schedule or travel;

        e.        all bank records, checks, credit card bills, account information, and other

financial records.

        f.        Any and all digital images, video, or other media.

        g.        Any and all text messages from whatever communication application

stored electronically on the phone

        h.        Call history for device.

        i.        Any and all contacts listed in the device.

        j.        Any and all social media posts, comments or responses.

k.      Any and all content, including communications, stored on mobile applications downloaded to phone.

l.      Location information stored on mobile applications or the electronic device;

m.      Any and all communications, be it voice messages, audio messages, text messages, group chats, social media direct messages, in whatever form.

n.      Evidence of user attribution showing who used or owned the **Target Devices** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

o.      Passwords, encryption keys, and other access devices that may be necessary toaccess the device;

p.      Records of or information about Internet Protocol addresses used by the device,

q.      Records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "Favorite" web pages, search terms that the user entered into any Internet search engine, and records or user-typed web addresses, aswell as evidence of the posting of videos, photos, or any material relevant to these crimes to anysocial networking site.

r.      Evidence of user attribution showing who used or owned the electronic device atthe time the things described above were created, edited, or deleted, such as logs phonebooks, saved usernames and passwords, documents, and browsing history.

***

As used above, the terms "records" and "information" include all of the foregoing items

of evidence in whatever form and by whatever means they may have been created or stored,

including any form of computer or electronic storage (such as flash memory or other media that

can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored

information seized or copied pursuant to this warrant in order to locate evidence, fruits, and

instrumentalities described in this warrant.  The review of this electronic data may be conducted

by any government personnel assisting in the investigation, who may include, in addition to law

enforcement officers and agents, attorneys for the government, attorney support staff, and

technical experts.  Pursuant to this warrant, the HSI may deliver a complete copy of the seized or

copied electronic data to the custody and control of attorneys for the government and their

support staff for their independent review.